## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. <u>19-CV-781</u>

MEGAN PITZ, an individual

      Plaintiff(s),

v.

COLORADO SEMINARY, d/b/a UNIVERSITY OF DENVER;
VIVA MOFFAT, individually and in her official capacity as Dean of Academics at the
University of Denver's Sturm College of Law;
JESSICA BOYNTON, individually and in her official capacity as Assistant Dean of Student
Affairs at the University of Denver's Sturm College of Law;

      Defendant(s).

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff, Megan Pitz who appears individually, hereby respectfully files this action against Defendant Colorado Seminary d/b/a University of Denver ("DU"), through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows.  This action seeks injunctive relief and appropriate damages and costs.

## I.      JURISDICTION AND VENUE

1.  The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Federal question jurisdiction arises under the Constitution and laws of the United States of America, including but not limited to the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*) and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701 *et seq.*).

2.  Plaintiff Megan Pitz is a resident of Denver County, Colorado.

3.  Defendant DU has as its principal place of business Denver County, Colorado.

4. The wrongful acts alleged by the plaintiff occurred in whole or in part in Denver County, Colorado.

## II. BACKGROUND FACTS

5. Plaintiff is a student at DU's Sturm College of Law ("Sturm"), working towards her Juris Doctorat degree. During Spring Semester of 2017, she was enrolled in three classes: Criminal Law, Lawyering Process II, and Torts.

6. Plaintiff is also a disabled individual as defined with the American with Disabilities Act ("ADA"). The ADA definition provides that an individual is disabled for purposes of the Act when a person has an impairment that "substantially limits a major life activity." 42 U.S.C. 12102(1). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at (2).

7. Plaintiff has chronic and episodic mental disabilities which cause debilitating symptoms at times. She has bipolar I disorder, generalized anxiety disorder, depression, and obsessive-compulsive disorder. These disabilities substantially limit Plaintiff and the major life activities of caring for herself, sleeping, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

8. Under the ADA, an episodic impairment is a disability if it substantially limits one of more major life activities when it is active. *Id.* at (4)(D).

9. Plaintiff has been under the care of DU's Health & Counseling Center ("HCC") and HCC psychiatrist Dr. Marjorie Lavin ("Dr. Lavin") for her disabilities since August 29, 2016.

10. Plaintiff is registered as a disabled student with DU's Disability Services Program Office ("DSPO").  She was granted accommodations such as extra time on tests and a reduced course load in acknowledgement of her needs related to her disabilities.

11. In April 2017, Plaintiff began experiencing a severe episode of her mental health disabilities.  Her Lawyering Process II class had already been completed and a mid-term in her Criminal Law class had been completed on February 23, 2017, before her episode.  Two obligations remained for her Spring semester: her final exam in Criminal Law (originally scheduled for May 5, 2017), and her final exam in Torts (originally scheduled for May 8, 2017).

12. As the Court knows, law school exams can be very stressful experiences and require a clear mind free from any mental health issues.  Sturm acknowledges this by allowing students to take "out of sequence" exams for reasons including "(3) The student has serious medical reasons verified in writing by appropriate medical personnel, or

(4) The student has a personal emergency supported by documentation." https://www.law.du.edu/forms/registrar/out-of-sequence.cfm.

13. Plaintiff's first exam in Criminal Law was scheduled for May 5, 2017.  In mid-April 2017, Plaintiff attempted to get an appointment with Dr. Lavin due to the episode she was experiencing.  Dr. Lavin was away from the office and so Plaintiff consulted with her and her staff by phone.  Dr. Lavin then recommended to Sturm's Dean of Students, Jessica Boynton ("Ms. Boynton"), that Plaintiff be excused from taking any exams until her symptoms had stabilized.  HCC's Associate Director, Dr. Carolee Nimmer ("Dr. Nimmer") emailed Ms. Boynton on May 3, 2017, with Dr. Lavin's recommendation and Plaintiff's

exams were postponed until Dr. Lavin could further examine her and medically clear her to take her law school exams.

14. On Monday, May 15, 2017, Plaintiff was evaluated by Dr. Lavin and Dr. Lavin medically cleared Plaintiff to take her first exam during the week of May 15-19, 2017.  Dr. Lavin sent an email saying as much to Ms. Boynton and stated in the email that Plaintiff would be re-evaluated by Dr. Lavin on the next Monday, May 22, 2017, to see if she could take another exam.

15. Ms. Boynton then scheduled Plaintiff's Criminal Law exam for May 19th, 2017.  Plaintiff took this exam and passed it.  The only obligation that remained for the Spring Semester was Plaintiff's tort exam.

16. Plaintiff was re-evaluated on Monday, May 22, 2017, and Dr. Lavin decided in her professional psychiatric judgment that Plaintiff was not cleared to take her next exam.

17. Ms. Boynton replied to Dr. Lavin asking when Plaintiff would next be evaluated, and Dr. Lavin stated that she would next evaluate Plaintiff on Tuesday, May 30, 2017 (not on Monday as Monday, May 29 was the Memorial Day holiday in 2017).

18. On Wednesday, May 24, 2017, Ms. Boynton then contacted Plaintiff, acknowledged that she was not medically cleared for the exam, and stated that Monday, May 26, 2017, was the last possible day that Plaintiff could take the Torts exam.  Ms. Boynton assumed that since Plaintiff would not be medically cleared by that time, she would not be taking the exam by the deadline.

19. At the same time, Ms. Boynton stated that she could not approve a late withdrawal from the Torts class and that neither she nor Sturm Dean Moffat ("Ms. Moffat") could approve

such a request.  She directed Plaintiff to the Office of Graduate Studies to request such a withdrawal.

20. Throughout this process, Ms. Moffat was Ms. Boynton's direct supervisor and Plaintiff was in communication with Ms. Moffat as well.  Ms. Moffat was aware of and involved in the handling of Plaintiff's accommodation requests.  Ms. Moffat originally told Plaintiff to come to her with any issues, but by the time of the Torts exam Ms. Moffat would consistently ignore emails and other communication from Plaintiff, and at times she did respond she simply put off the issue and advised Plaintiff to take care of herself, implying that it was Plaintiff's fault that her symptoms had flared up.

21. On May 25, 2017, Plaintiff wrote both Ms. Boynton and Ms. Moffat attempting to resolve the situation in harmony with her then-existing symptoms, DU policies, and DU's obligations under the ADA.  Plaintiff stated that she hoped to be medically cleared to take the exam within the next six weeks and proposed that if she was unable to then she should be retroactively withdrawn from Torts and be able to keep the rest of her credits from the other coursework completed that semester.  The only other option that had been proposed by Ms. Boynton and Ms. Moffat was a retroactive medical leave which would wipe out all of Plaintiff's work from Spring Semester 2017, including the two courses she had completed.

22. The option of medical leave presented as the only option to Plaintiff is an extremely punitive and difficult process for a student who wishes to return after a medical leave.  It requires a petition to return and other barriers to a student re-entering law school at DU.  Plaintiff's experience thus far where DU treated accommodations as frivolous requests, requiring Plaintiff to continually discuss and argue with DU staff before receiving

reasonable accommodations, showed Plaintiff that DU would not be likely to grant a petition to return if she did take this option and go on medical leave.

23. The six week extension was a reasonable accommodation by Plaintiff to allow her time to medically stabilize from the effects of her disability so that she could take her exam not impaired by these effects and allowing her to fully participate in her course of study as a non-disabled student would.

24. Plaintiff was medically unable to take the exam (which was worth 85% of her Torts grade) before the May 26, 2017, deadline set by Ms. Boynton and her grade was reflected as an "F." The school records indicate that this is noted as an "earned grade", even though Plaintiff did not take the exam and was completely unable to take the exam as determined by a licensed medical doctor with over forty years of experience and employed by DU, Dr. Lavin.

25. At all times in interactions between Plaintiff and Ms. Boynton, Ms. Boynton evidenced a willful disregard of Plaintiff's disabilities and the debilitating effect that they have on Plaintiff's ability to concentrate, communicate, read, think, and care for herself, among others. Ms. Boynton compared Plaintiff's disabilities to the flu or having a broken arm, and suggested that Plaintiff, who was medically forbidden from taking an exam, could have taken said exam if she wanted to. Ms. Boynton, who as far as Plaintiff knows is not a licensed medical professional of any stripe, also stated that Plaintiff could have been more proactive with her health to avoid a flare-up during exam time. Ms. Boynton also said, without evidence or statements backing it up, that Plaintiff has not been entirely honest about her disabilities, implying that Plaintiff was in some way exaggerating her disability

and its effects. Finally, Ms. Boynton stated that it would not be fair to Plaintiff's classmates for the school to accommodate Plaintiff's disability.

26. It appears that Sturm as represented by Ms. Boynton and Mr. Moffat did not make a determination on the May 25th proposal from Plaintiff, but rather sent it on to Joshua Kaufman ("Mr. Kaufman"), the Director of the DSPO at DU. Mr. Kaufman, although by virtue of his position he should have a good grasp on the ADA and what is considered a disability, is like Ms. Boynton not a medical professional and stated to Plaintiff in a meeting around this time that Bipolar is not a medical disability, a position clearly contrary to the ADA.

27. Mr. Kaufman sent a denial letter some weeks later, however in between May 25th and the receipt of the denial letter, Defendants did not bother to see if Plaintiff was able to sit for the exam.

28. Mr. Kaufman stated in his denial letter to Plaintiff that he had reviewed the request and the documentation from Dr. Lavin and decided to deny her any accommodations or extensions of her exam schedule. Although the Student Handbook clearly states by implication that it is possible to take an exam after the scheduled exam period, Mr. Kaufman decided that to grant an extension to Plaintiff would "fundamentally alter the program curriculum" and denied her request.

29. Mr. Kaufman then addressed the questions of whether Plaintiff could retroactively drop Torts and directed her to the Office of Graduate Studies to make such a request.

30. Once Mr. Kaufman denied Plaintiff's reasonable accommodation, a pattern of retaliation for her accommodation requests started against Plaintiff.

31. The Americans with Disabilities Act also specifies that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." And "it shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."  42 U.S.C.A. § 12203(a)-(b).

32. To establish a prima facie case of retaliation under ADA, plaintiff must demonstrate that: (1) he engaged in protected activity, (2) he suffered a materially adverse action by the defendant either after or contemporaneous to the protected activity, and (3) a causal connection between the protected activity and the adverse action. *Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (10th Cir. 2007).

33. To show a causal connection between the protected activity and the adverse action a plaintiff must produce "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Reinhardt v Albuquerque Public Schools Bd. of Educ.*, 595 F.3d 1126, 1134 (10th Cir. 2010) (quoting *Haynes v. Level 3 Commc'ns, LLC,* 456 F.3d 1215, 1228 (10th Cir. 2006)).

34. In June 2017, after being denied her reasonable accommodations, Plaintiff was referred to the Academic Exception Petition process, a process unrelated to ADA accommodations. Instead of properly handling Plaintiff's requests under the ADA, DU attempted to shunt her into a separate process where she would be unable to request the proper

accommodations.  The academic petition process that DU insisted the Plaintiff go through was not designed for ADA accommodations but rather academic or personal issues.

35. This process requires a letter from the Professor of the class in which a student is seeking an academic exception (here, Torts) and a letter from the head of the department, a role filled by Ms. Boynton.  Without these letters, the Committee that reviewed academic exceptions would not even consider the Plaintiff's petition.

36. Initially,  the Torts professor, John Campbell ("Mr. Campbell), was willing to write a letter for the Plaintiff.  However, once Mr. Campbell became aware that the academic exception petition concerned a disability, he declined to write the letter.  Mr. Campbell seemed confused by the forced interplay between the academic exception petition and the school's obligations under the ADA,  and told Plaintiff that he would have to consult with colleagues who were more knowledgeable about the area of disability law.

37. In order to get the Academic Exception, Plaintiff would also have to provide a letter from Ms. Boynton, the very individual that was interfering with and denying Plaintiff's reasonable accommodation requests.  Plaintiff had a meeting with Ms. Boynton wherein she refused to write the letter and told Plaintiff that if she had to write the letter it would not be in support of her petition.

38. Through these actions, Defendants pushed the Plaintiff into a forum that was not appropriate for resolving disability issues and then used the rules of this new forum to deny Plaintiff a chance to even be fairly evaluated in that forum that Defendants themselves had forced Plaintiff to enter.  This circular treatment of Plaintiff is a type of treatment that the ADA was designed to prevent.  The findings and purpose of the ADA state that individuals with disabilities "continually encounter various forms of discrimination, including …

communication barriers [and] overprotective rules and policies" and that the ADA was created for the elimination of such discrimination.  42 U.S.C. § 12101(a)(5) and (b)(1).

39. In July 2017, Dean Boynton called the police (state troopers) on Plaintiff either immediately before or during a call with Plaintiff.

40. Plaintiff had received an email from Dean Boynton denying the requested accommodation of the W in Torts.  Specifically, this email stated that the only way to obtain a "W" was through the non-ADA petition process, described above, and that Plaintiff should not call the law school.

41. Plaintiff then called a former faculty member with whom she had a good relationship.  This individual asked Plaintiff if it would be okay to have Ms. Boynton call her to discuss. Although Plaintiff did not think this was a good idea because of the prior treatment by Ms. Boynton, Plaintiff agreed in an attempt to be cooperative.  Ms. Boynton then called the police on Plaintiff. State troopers made contact with Plaintiff and a report was filed, damaging Plaintiff's professional reputation and damaging her future prospects for passing Character and Fitness evaluations in order to become a practicing attorney.

42. As described above, in October 2017 Plaintiff was informed that in order to make an Academic Exception Petition she would need a letter from the Torts Professor Mr. Campbell and that the Committee that reviews petitions would not review her petition without this letter.  Mr. Campbell was initially open to giving the letter (telling Plaintiff that she should let him know what she needed and that he would respond promptly) but was confused about what the letter would entail.  After Plaintiff described to Mr. Campbell the basic letter that was required and why Plaintiff needed it, he refused to provide such a letter and seemed to be consulting legal advice as to whether he could write such a letter.

43. On December 17, 2017, Plaintiff made an Academic Exception Request to request that her "F' in Torts be withdrawn and a "W" be entered instead, which would not affect her GPA.

44. On December 22, 2017, this Request was denied by Jennifer Karas ("Ms. Karas"), the Vice Provost for Academic Programs at DU.  No reference to Plaintiff's disability was made in the explanation of denial and Ms. Karas instead simply referred to Plaintiff's medical inability to take the Torts exam because of her disability as "unfortunate personal circumstances."

45. Through the Academic Exception process DU continually victimized Plaintiff for her illness.  They first referred her to this process, disregarding her ADA claim and treating her request as an academic petition only.  Then they made it difficult, if not impossible, for her to even complete the process because of the issues with getting a letter from Mr. Campbell, who was never properly advised by the school of his obligations under the academic exception process, and Ms. Boynton, who was the very person denying her accommodations.  Finally, the denial that was given to Plaintiff referred to her documented disability for which she was protected by and qualified for accommodations under the ADA as "unfortunate personal circumstances."

46. In January and February 2018, University Counsel Paul Chan and Beth Robischon agreed to replace the Torts "F" grade with a "W", but only if Plaintiff never asked for such an accommodation again.  This proposed settlement would force Plaintiff to give up her statutory right to reasonable accommodations under the ADA and was the only offer made by DU to resolve this issue.  This offer was retaliatory because it was directly connected to Plaintiff's earlier request for accommodation and contained an adverse action of pre-emptive denials of future accommodation requests.  The school agreed to Plaintiff's

reasonable accommodation only by demanding that she never make reasonable accommodation requests again, attempting to restrict her from asserting her rights under the ADA.

47. In Spring 2018, Plaintiff retook the Torts class for which she previously received the "F" and received a "B" grade.

48. In May 2018 Plaintiff took an exam with a proctor, Ms. Scherling.  When Plaintiff told the proctor her name, Ms. Scherling stated "I know who you are" in a tone that implied she knew about Plaintiff's struggles with DU up to that point.  One of Plaintiff's accommodations for this exam was that she could tape up paper to block windows so as to limit visual distractions during the exams (of other students passing in the halls or otherwise).  Ms. Scherling did not wish to allow Plaintiff to do so and even argued over Plaintiff over authorization to use paper to tape up the windows.  Ms. Scherling yanked paper out of Plaintiff's hands and demanded that Plaintiff use her own paper until Plaintiff convinced the proctor that she was authorized to use the school paper to cover the windows, a reasonable accommodation that the school had previously granted.

49. Ms. Scherling then did not allow Plaintiff to use the room that she had been assigned to for taking the exam.  Ms. Scherling forced Plaintiff to use the room that had the most open window space even though the other available rooms were empty.

50. In May 2018 Plaintiff was denied financial aid because of her GPA.  However, in calculating the GPA DU did not consider the "B" Plaintiff had received from her Torts retake of Spring 2018.  This was retaliatory and reflects an attempt to make the Plaintiff withdraw from school.

51. Without the "F" that was the result of her disability Plaintiff has been in good academic standing throughout her law school career.

52. In May 2018 Plaintiff met with Ms. Boynton, as she had met with her throughout the year because of her probationary status because of the "F" grade. Ms. Boynton discouraged Plaintiff from registering for Fall semester classes. Ms. Boynton told Plaintiff that she should take the classes she needed to complete 1L year "elsewhere."

53. Defendants continued to make it difficult for Plaintiff to complete exams. In summer 2018, she had an exam where two proctors were assigned, including Ms. Scherling, the proctor from May 2018 whom Plaintiff had requested not be assigned to her in the future. The two proctors spoke to and bothered Plaintiff to the extent she had to ask them to give her space to concentrate on her exam. The actions of the proctors in disturbing Plaintiff before the exam made it difficult for Plaintiff to concentrate on her exam performance. In Fall 2018, she was forced to take an exam while experiencing symptoms of her disability.

54. In August 2018, without any prior notice to Plaintiff, the Director of the Mentorship Program at DU emailed Plaintiff's professional mentor and informed her incorrectly that Plaintiff had left DU. The email stated "I am sorry to inform you that your student Megan Pitz is not returning to the law school this Fall. From time to time students just don't adapt to the law school environment for a variety of reasons or because they decide that another law school is a better fit." This email shows the retaliation by DU and their attempt to remove Plaintiff from the school because of her request for accommodations. Ms. Boynton's comments about Plaintiff taking the remaining 1L classes elsewhere plus this email incorrectly stating that Plaintiff had left the school were retaliatory in nature and damaged Plaintiff's professional reputation.

55. In August 2018 Plaintiff was told that she must achieve a 2.3 GPA within a short timeline or she would be withdrawn from the school against her will.  At this time the Student Handbook was revised by DU to state that a 2.3 GPA was required.  However, the Handbook still referred to the previous requirement of a 2.0 GPA, which Plaintiff had already achieved.  An inference can be drawn that Plaintiff was targeted by an increase of the GPA requirement in Fall 2018 and that this action was part and parcel of the attempts to force Plaintiff to leave DU.  Because of the 2.3 GPA requirement and Plaintiff's reduced course load (which was an accommodation because of her disability) it would be impossible for Plaintiff to reach a 2.3 GPA within the timeline demanded by the school.

56. In December 2018, Plaintiff requested to use the Out-of-Sequence exam policy, an accommodation for students even when they don't have a disability.  This was a reasonable request to accommodate Plaintiff's disability that had no detrimental effect on the school or the program, and was an accommodation that the Plaintiff had been granted before by DU.  On this occasion her request was denied.  DU informed Plaintiff on December 11 at 6:18pm, the night before the exam, that her request was denied.

57. The only difference between the previous time when Plaintiff was allowed to use the Out-of-Sequence exam policy and the December 2018 refusal to allow her this accommodation was Plaintiff's insistence that DU grant her reasonable accommodations and the incidents described in this Complaint.  Denying her use of this accommodation was a directly retaliatory action against Plaintiff because Plaintiff would not quietly accept her treatment by DU and continued to ask for reasonable accommodations from DU.

58. Throughout this semester and up to January 2019, Plaintiff received emails from Ms. Boynton continually stating that Plaintiff ran the risk of failing out of the school because

of the "F".  These emails exacerbated her symptoms and further retaliated against Plaintiff, especially when Ms. Boynton knew that stress usually caused Plaintiff's symptoms to flare up and affect her performance as a law student.  These emails reminded Plaintiff of the GPA requirements that, because of the reduced course load, were impossible for Plaintiff to achieve while the "F" remained on her record.

59. Because Plaintiff has a less than full course load, itself an accommodation of her disability, it would be impossible for her to reach the GPA milestone goal in the timeframe set by Defendants.  To this end, Plaintiff requested a pro-rata extension of the milestone to take into account her course load and was denied this accommodation by the Defendants.

60. On February 28, 2019, Plaintiff was denied the accommodation of a room to take her exam free from noise and distraction.  Defendants pre-emptively declined to enforce the library policy of no extended conversations in study rooms.  Enforcement of this policy would allow Plaintiff to take her exam in the environment necessary to accommodate her disabilities.  Instead, Plaintiff was offered other rooms that are not in quiet areas of the library.

61. Defendants continue to deny Plaintiff's accommodations and investigate and question the Plaintiff's documented disabilities, causing severe distress and recurring symptoms. Defendants currently deny accommodations that Plaintiff previously had.

62. Defendants also retaliated against Plaintiff by denying her breaks during her exams (which were longer because of her accommodation of additional time) and refusing her to use her emotional support animal even in a study room where other students have been allowed to have their emotional support animals.

63. Ms. Boynton in particular appears to be on a mission of retaliation against the Plaintiff, investigating her by sending emails to Plaintiff's professors inquiring about Plaintiff's attendance and behavior on certain days and preventing Professors from approving appropriate accommodations. These emails and investigations also damage Plaintiff's professional reputation as she is being singled out for special investigatory treatment by Defendants solely because of her disability.

64. In addition, Ms. Boynton, DSPO, and school administrators consistently ignore Plaintiff's requests for accommodations since the retaliation began. On February 21, 2019, Plaintiff sent an email to these parties asking for accommodation on a midterm exam and was ignored. On February 27 a follow up email was sent by Plaintiff and school officials continued to ignore her requests. This pattern of delay has been incredibly damaging to the Plaintiff because she cannot rely on DSPO or school administrators to review her reasonable accommodations requests within a reasonable time increasing uncertainty, stress, and flare-ups of her disability.

65. Plaintiff has also been denied accommodations for practice exams and been forced to take exams at times that cause conflict with her medications. These policies, implemented after the retaliation began, are unnecessary and punitive.

66. Since the Plaintiff was forced to take the "F" grade she has been on probation and is in constant fear of DU removing her from school. This prevents the Plaintiff from taking externships and applying to journals, two key parts of a law school education and career preparation. This anxiety has worsened her disability and led to further emotional and psychological problems for the Plaintiff. By forcing Plaintiff to take exams while severely

ill because of her disability DU has affected her grades and her well-being and DU has

damaged her professional reputation and prospects for future employment.

### III.   CLAIMS AND CAUSES OF ACTION

#### A.   FIRST CLAIM FOR RELIEF
#### (*VIOLATION OF SECTION 504 OF THE REHABILITATION ACT*- AGAINST DU)

67. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

68. Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and its

implementing regulations apply to recipients of federal financial assistance from the

Department of Education.  *See* 34 C.F.R. § 104.2.  DU receives such federal financial

assistance and is thus subject to Section 504.

69. Among other things, Section 504 requires that:

> A recipient may not, directly or through contractual or other arrangements, utilize
> criteria or methods of administration (i) that have the effect of subjecting qualified
> handicapped persons to discrimination on the basis of handicap, (ii) that have the
> purpose or effect of defeating or substantially impairing accomplishment of the
> objectives of the recipient's program with respect to handicapped persons, or (iii)
> that perpetuate the discrimination of another recipient if both recipients are
> subject to common administrative control or are agencies of the same states.
> C.F.R. § 104.4(b)(4).

70. With regards to postsecondary educational entities, 34 C.F.R. § 104.43 prohibits

universities receiving federal funds from excluding, discriminating against, or otherwise

denying benefits to qualified students on the basis of their handicap.

71. Moreover, any such university must "make such modifications to its academic

requirements as are necessary to ensure that such requirements do not discriminate or

have the effect of discriminating, on the basis of handicap, against a qualified

handicapped applicant or student."  34 C.F.R. § 104.44(a).

72. Education institutions have a "real obligation… to seek suitable means of reasonably accommodating a handicapped person *and to submit a factual record indicating that it conscientiously carried out this obligation.*" *Wong v. Regents of the Univ. of California*, 192 F.3d 807, 817 (1999) (quoting *Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1048 (9th Cir. 1999) and *Wynne v. Tufts Univ. Sch. of Med.,* 932 F.2d 19, 25–26 (1st Cir. 1991) (en banc)).

73. Plaintiff was and is qualified to attend DU.

74. Despite notice of Plaintiff's qualifying handicap, DU intentionally discriminated against her, were deliberately indifferent to her rights, and intentionally denied her benefits solely on the basis of his disability when DU treated her differently from other students solely on the basis of her disability and working to damage her academic prospects and professional reputation.

75. DU also failed to carry out its obligation to undertake a conscientious, fact-specific investigation of what would constitute a reasonable accommodation, and failed to provide Plaintiff with a reasonable accommodation.

76. Defendant DU's violation of Plaintiff's rights under Section 504 caused Plaintiff to suffer damages, including but not limited to psychological, emotional, and reputational damages in addition to economic damages and the loss of educational and career opportunities, as well as attorney's fees incurred in this action.

## C.   SECOND CLAIM FOR RELIEF
### (*VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT-AGAINST ALL DEFENDANTS*)

77. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

78. Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12101, and its implementing regulations apply to public entities, such as DU.

79. Title II bars public entities from discriminating against qualified individuals with a disability or, by reason of their disability, excluding them from participation in or denying them the benefits of the services, programs, or activities of the public entity.  42 U.S.C. § 12132.

80. Plaintiff's mental and physical conditions alleged herein constitute disabilities protected under Title II.

81. As explained above, Plaintiff was and is qualified to attend DU.

82. Plaintiff was excluded from participation in or denied the benefits of DU's services, programs, or activities.

83. That exclusion, denial of benefits, and discrimination was by reason of Plaintiff's disability.

84. Defendants' violation of Plaintiff's rights under Title II caused her to suffer damages, including but not limited to psychological, emotional, and reputational damages in addition to economic damages and the loss of educational and career opportunities and attorneys' fees and costs in this action.

### D.   THIRD CLAIM FOR RELIEF
***(BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING  – AGAINST DU)***

85. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

86. Plaintiff's agreement with DU to provide educational services in exchange for the payment of tuition monies qualifies as a contract, involving the mutual exchange of promises, mutual assent, and supporting consideration.

87. Thus, it is subject to the duty of good faith and fair dealing that is implied into every contract, under which a contracting party is prohibited from exercising its discretion in a manner that contradicts the other party's reasonable expectations thereunder or in a manner that deprives the other of their benefits under the contract.

88. DU's actions in refusing to accommodate Plaintiff and preventing her from enjoying the benefits afforded to her under the contract breached the duty of good faith and fair dealing, causing her to suffer injuries, damages, and losses in an amount to be proven at trial.

### E. FOURTH CLAIM FOR RELIEF
### (*VIOLATION OF THE COLORADO ANTI-DISCRIMINATION ACT- AGAINST ALL DEFENDANTS*)

89. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

90. The Colorado Anti-Discrimination Act ("CADA") prohibits discrimination on the basis of disability in places of public accommodation. *See* C.R.S.A. § 24-34-601 et. seq.

91. Under C.R.S.A. § 24-34-601(1), a "place of public accommodation" specifically includes "an educational institution".

92. Prohibited discrimination under C.R.S.A. § 24-34-601(2)(a) includes directly or indirectly refusing, withholding from, or denying an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations on the basis of their disability.

93. DU violated CADA through its wrongful actions alleged herein.

94. DU's violations of Plaintiff's rights under CADA caused Plaintiff to suffer damages, including but not limited to psychological, emotional, and reputational damages in

addition to economic damages and the loss of educational and career opportunities and attorney fees and costs in this action.

### F.  FIFTH CLAIM FOR RELIEF
*(BREACH OF CONTRACT-AGAINST DU)*

95. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

96. Plaintiff's agreement with DU to provide educational services in exchange for the payment of tuition monies qualifies as a contract, involving the mutual exchange of promises, mutual assent, and supporting consideration.

97. Part of that contract was DU's promise to comply with its legal obligations not to discriminate against Plaintiff and to accommodate Plaintiff's disabilities.

98. Yet, in refusing to accommodate Plaintiff's documented disabilities, DU breached, and in failing to accommodate her disabilities, which actions were unlawful, constitute a breach of that contract and caused her to suffer injuries, damages, and losses in an amount to be proven at trial.

### G. SIXTH CLAIM FOR RELIEF
*(INJUNCTIVE RELIEF)*

99. Plaintiff realleges all other paragraphs as if fully set forth herein.

100.     As evidenced by the dispute over Plaintiff's appropriate accommodations and this Complaint, an actual controversy exists between the parties as to whether the Defendants violated Section 504, the ADA, CADA, and the contract for educational services, and therefore an actual justiciable controversy is involved.

101.     Under 42 U.S.C. 12188, Plaintiff petitions for injunctive relief including an order to Defendants to modify their policy and not pursue dismissal of Plaintiff from DU.

102.     Plaintiff further requests that the Court: (1) issue a temporary restraining order and a preliminary injunction pursuant to F.R.C.P. 65, ordering Defendants, their officers, agents,  employees, successors, attorneys, and all those in active concert or participation with them to refrain immediately and pending the final hearing and determination of this action from discriminatory conduct including dismissal from the university; (2) issue a permanent injunction perpetually enjoining and restraining Defendants, their officers, agents, employees, successors,  attorneys, and all those in active concert or participation with them, of the conduct complained; (3)  award to Plaintiff costs and disbursements, as well as reasonable attorney's fees; and (4) award Plaintiff such other and further relief as this Court may deem proper, including but not limited to requiring Defendants to effect proper training to prevent the recurrence of such conduct in their hiring, firing, training and educational policies and procedures.

103.     Plaintiff, requests that judgment enter in her favor and against the Defendants, in an amount to be determined by a judge or jury and that the Court also award the Plaintiff her legal fees and costs incurred in pursuing this action.

## IV.     DAMAGES

104.     Defendants' discriminatory and retaliatory conduct described above has caused the Plaintiff the following damages:

a.   Lost future wages and benefits in amounts to be established at trial;

b.   Damage to professional reputation, in an amount to be established at trial;

c.   Emotional upset, stress, and anxiety in an amount to be established at trial;

d.  Medical costs and damages as a result of Defendants' discriminatory conduct in an amount to be established at trial;

e.  Out of pocket expenses, litigation costs, and attorney fees in amounts to be established at trial.

105.     Defendant's violation of Title II was willful, entitling the plaintiff to an award of punitive damages to the fullest extent permitted by law.

## V.      REQUEST FOR RELIEF

Plaintiff Megan Pitz requests that the court enter judgment in her favor and against Defendant DU as follows:

106.     Awarding the Plaintiff special damages for lost future wages, benefits, and out of pocket expenses in amounts to be established at trail;

107.     Awarding the Plaintiff general damages for emotional distress and damage to professional reputation in an amount to be established at trial;

108.     Punitive damages, pursuant to 42 U.S.C. § 1981, 2000(e), in the maximum amount permitted by law;

109.     Awarding the Plaintiff statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action;

110.     Granting the Plaintiff injunctive relief;

111.     Awarding the Plaintiff post-judgment interest on his/her/its lost wages award and economic loss; and

112.     Awarding the Plaintiff any additional and further relief that the court finds equitable, appropriate, or just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

s/ Tyler Jeffery
Tyler Jeffery, Esq., Atty. Reg. #48460
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 588-2096
E-mail: tyler@coloradolawteam.com
Attorney for Plaintiff

/s Igor Raykin
Igor Raykin, Esq. #43081
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 767-1846
E-mail: igor@coloradolawteam.com
Attorney for Plaintiff